1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

CECILIA FRAHER,                          CASE NO.    1:06-cv-1120-AWI-MJS

               Plaintiff,        FINDINGS AND RECOMMENDATION
                                         RECOMMENDING DEFENDANT'S MOTION
     v.                          FOR SUMMARY JUDGMENT BE GRANTED

SURYADEVARA,                             (ECF No. 143)

            Defendant.        OBJECTIONS DUE MARCH 15, 2011

_____/

Plaintiff Cecilia Fraher ("Plaintiff"), a state prisoner, filed this civil rights action pursuant to 42 U.S.C. § 1983 on August 21, 2006.  This action proceeds on Plaintiff's October 16, 2009 Third Amended Complaint.  The only remaining Defendant is Sampath K. Suryadevara, M.D.   Plaintiff's Third Amended Complaint alleges that Defendant Suryadevara was professionally negligent and deliberately indifferent to her serious medical needs in violation of the Eighth Amendment.

Before the Court is Dr. Suryadevara's Motion for Summary Judgment.  (ECF No. 143.) Plaintiff filed an Opposition and Defendant filed a Reply.  (ECF Nos. 153 & 155.) The Court considered Defendant's motion on the record without a hearing pursuant to Local Rule 230(g).  The Court carefully reviewed and considered all papers filed by the parties

including all evidence, arguments, points, authorities, declarations, testimony, the statement of undisputed facts and response thereto, and objections.[1]

## I.    FACTUAL BACKGROUND

Unless otherwise indicated, the facts summarized here are taken from Defendant's Statetment of Undisputed Material Facts ("DUF") which, except where reflected below, are not disputed by Plaintiff:

### A.    The Parties Background and Initial Treatment at CCWF

Plaintiff Cecilia Fraher is a fifty-four (54) year old woman who since 2003 has been serving a forty-five year to life sentence at Central California Women's Facility ("CCWF"). (DUF Nos. 14 &15.)  She has no training, education or experience in the field of medicine. (Id. at 16-19.)

Defendant Dr. Suryadevara is a doctor of medicine practicing internal medicine. (DUF Nos. 1-3.)  From July 2001 until February 2008, he was employed by the California Department of Corrections as the Chief Medical Officer ("CMO") at Central California Women's Facility ("CCWF").  (Id. at 4 & 7.)  As such, his duties included, but were not limited to, providing clinical management, supervision, and leadership to all medical clinicians and to supervise the delivery of health care services at CCWF.  (Id. at 5.)  He also reviewed and ruled on inmate complaints ("602s") about medical treatment and care. (Id. at 6.) Suryadevara has never personally examined, diagnosed, or treated Plaintiff.  (Id. at 8.)  He learned of her condition in the course of his review of her 602 complaints.  (Id.

---

[1] Lack of reference to a particular piece of evidence, argument or other filing should not be read to suggest the Court did not consider same.  The Court reviewed, considered, and applied the evidence it found to be admissible, material, and appropriate to the motion. It does not rule on objections in the context of such motions.

at 12.)

In 1998, Plaintiff underwent an aortic arch transplant and cardiac pacemaker implant. (DUF Nos. 20 & 21.)  In a June 24, 2003 examination following Plaintiff's transfer to CCWF, Dr. Mohammad Ashraf noted her cardiac history and requested that a technician from St. Jude Medical, the company that manufactured Plaintiff's pacemaker, evaluate its performance.  Dr. Ashraf also requested an echo cardiogram and a carotid ultrasound, both of which were performed on July 23, 2003.  (Id. at 10, 23, 24 & 25.)  Dr. Ashraf scheduled a December 4, 2003 office visit for the St. Jude representative to evaluate Plaintiff's pacemaker.  The representative cancelled the appointment.  (Id. at 26.)  Dr. Ashraf proceeded to examine Plaintiff and, according to Defendant, he assessed the pacemaker using an EKG and a magnet and concluded it was then working.  (DUF No. 27.)   Plaintiff denies any test of the pacemaker took place. (Fraher Decl. ¶ 7.)  Dr. Ashraf advised Plaintiff and the prison staff that a pacemaker evaluation by the manufacturer's representative was needed.  (DUF No. 28.)

Soon thereafter Plaintiff asked the Prison Law Office and Justice Now to assist her in obtaining an immediate evaluation of her pacemaker.[2]   (Fraher Decl. ¶ 10.)  On December 17, 2003, Plaintiff was transported to Madera Community Hospital for complaints of intermittent chest pain and palpitations.  An independent physician evaluated Plaintiff via EKG, chest x-ray and other cardiac work-up. The EKG show a paced regular rhythm. (DUF No. 30.) After this appointment, Plaintiff began suffering chest pain, anxiety,

---

[2]  Defendant contends that at this time Plaintiff filed a 602 complaint in which she complained that Dr. Ashraf  did not test her pacemaker and she requested treatment by a different cardiologist. (DUF No. 29.)  It may be that Defendant has mistakenly characterized Plaintiff's requests for assistance with a 602 she filed later.  The dispute is of no consequence to the Court's evaluation of this Motion.

emotional distress, and sleeplessness.  (Fraher Decl. ¶ 18.)

### B.    Plaintiff's Pacemaker Replacement

On January 26, 2004, Plaintiff's pacemaker was evaluated in Dr. Ashraf's office by a technician from St. Jude Medical.  The technician advised that the Plaintiff's pacemakers battery would last only three (three to four, according to Defendant) more months and needed to be replaced. (DUF No. 31; Dec. Fraher ¶ 11.)  According to Plaintiff, Dr. Ashraf told her that her chest pain was caused by the low battery and would increase until the battery was replaced.  He said he would schedule a pacemaker replacement as soon as possible.  (Fraher Decl.  ¶ 11.)  Plaintiff's emotional distress increased substantially after this doctor visit.  (Id. ¶ 18.)

On March 10, 2004, Plaintiff filed a 602 complaining that she still had not had the pacemaker  test  Dr. Ashraf recommended on December 4, 2003, and she requested a consultative evaluation by a different cardiologist. (DUF No. 32.)

On March 26, 2004, Dr. Ashraf examined Plaintiff and evaluated her pacemaker with an EKG and a magnet and determined that the pacemaker was functioning normally. (DUF No. 33.) However, Ashraf also determined that the pacemaker had a life expectancy of only one month and scheduled pacemaker replacement surgery for April 8, 2004. (Fraher Decl. ¶ 13.)

On March 29, 2004, Plaintiff filed another 602 complaint alleging that Dr. Ashraf had not performed the test recommended in December 4, 2003, and she again requested treatment by another cardiologist.  (DUF No. 34.)

On April 5, 2004, prison officials responded to Plaintiff's March 10, 2004 602 complaint by noting that Plaintiff had been seen by another cardiologist (on March 26,

2004) and was scheduled for pacemaker replacement on April 8, 2004.  Dr. Suryadevara approved this response.  (DUF No. 35.)

On April 7, 2004, prison officials responded to Plaintiff's March 29, 2004 602 complaint by noting that the same complaint had already been replied to. (DUF No. 36.)

On April 8, 2004, Plaintiff's  pacemaker generator was surgically replaced.  (DUF No. 37.)  After the replacement, Plaintiff exercised by walking eight to ten miles daily. (Id. at 41.)  By May 2004, she was not suffering physical or emotional problems with her pacemaker. (Id. at 42.)  The new pacemaker has functioned normally and without ill effect to Plaintiff.  (Id. at 47.)

## C.   Plaintiff's Post-Surgery Treatment

On April 27, 2004, Plaintiff sought review of the April 5, 2004 response to her March 10, 2004 602 complaint and again requested that a cardiologist other than Dr. Ashraf treat her. (DUF No. 38.) On June 7, 2004, Defendant Dr. Suryadevara denied Plaintiff's appeal in part by noting that her pacemaker had been replaced and granted it in part by stating that Plaintiff would be seen by a different cardiologist.  (Id. at 40.)

On July 29, 2004, Dr. Singh, a different cardiologist, began treating Plaintiff's heart condition. (Fraher Decl. ¶ 21.)  He recommended that Plaintiff's pacemaker be checked every six months and regularly requested that a St. Jude Medical technician evaluate Plaintiff's pacemaker.  (Id.; DUF Nos. 43-45.)

In December 2004, Plaintiff sought treatment for chest and arm pain and, when it was not provided, filed 602s in that and the next month. (Fraher Decl. ¶¶ 22 & 23.) Appointments in March and April 2005 for pacemaker checks were cancelled by the St.

Jude representative.  Accordingly, Plaintiff filed a 602 on April 5 stating that her pacemaker calibration was three months overdue. (Id. ¶¶ 24 & 27.) Plaintiff's pacemaker was checked and calibrated by a St. Jude's representative on May 2, 2005.  (Id. ¶ 28; DUF No. 39.)

On October 13 and 17, 2005, Plaintiff advised prison officials that she was due for a six month pacemaker calibration on November 2, 2005.  (Fraher Decl. ¶¶ 29 & 30.) When it did not occur, she filed 602s on November 3 and November 30, 2005. (Id. ¶¶ 31 & 33.)  CDCR's response indicated Plaintiff had been or would be taken care of in scheduled cardiology appointments.  (Id. ¶ 34.)

Plaintiff was seen by Dr. Singh on December 9, 2005.  (Fraher Decl. ¶ 35.)  Dr. Singh submitted a request for services and asked that Plaintiff's pacemaker be checked every six months.  (Id. ¶ 36.)  On December 13, 2005, Plaintiff appealed CDCR's response to her November 602s because calibration had not yet occurred.  (Dec. Fraher ¶ 37.)  In a response dated December 27, 2005 that was approved by Dr. Suryadevara, Plaintiff was informed that CDCR would "fax notation regarding 6 month pacemaker check" and provide the follow-up pacemaker protocol to Plaintiff for future check-up appointments.  (Id. ¶ 39.)

On January 17, 2006, Plaintiff filed a request for Second Level Review of the CDCR's December 27, 2005 response to her 602; Plaintiff noted that her pacemaker still had not been calibrated. (Fraher Decl. ¶ 41.)  On January 23, 2006, eight and one-half months after the prior calibration, Plaintiff's pacemaker was checked and found to be functioning normally.   (Fraher Decl. ¶ 42.) Dr. Singh recommended a follow-up appointment and pacemaker test in six months.  (Id. ¶ 42.)

On February 16, 2006, Dr. Suryadevara responded to Plaintiff's Request for Second Level Review stating that "[e]very effort will be made" to schedule re-calibration in six

-6-

months but that CCWF depends on specialists to provide appointment dates and does not have discretion as to when such appointments will occur.  (Fraher Decl. ¶ 43.)  As an example, Suryadevara pointed out that a March 2005 calibration appointment had been cancelled by the St. Jude representative and that CCWF had no control over such situations.  (Id.)

On July 26, 2006, Plaintiff filed a 602 complaining that her six month calibration had not yet occurred.  (Dec. Fraher ¶ 44.)  Plaintiff received an informal response the next day stating that an appointment had been scheduled.  (Id. ¶ 46.)  Plaintiff's pacemaker was calibrated on August 7, 2006.  (Id. ¶ 47.)

In 2007, Dr. Singh referred Plaintiff to U.C. Davis Medical because an aortic aneurism identified in 2005 had grown larger.  (DUF Nos. 48-51.)  In August 2009, Plaintiff underwent surgery on the aortic valve.  (Id. at 52.)

## II.   **LEGAL STANDARD**

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Summary judgment must be entered, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The "party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine

issue of material fact." <u>Celotex</u>, 477 U.S. at 323 (quoting Rule 56(c) of the Federal Rules of Civil Procedure).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Fed. R. Civ. P. 56(e); <u>Matsushita</u>, 475 U.S. at 586 n.11.

The parties bear the burden of supporting their motions and oppositions with the papers they wish the Court to consider and/or by specifically referencing any other portions of the record they wish the Court to consider.  <u>Carmen v. San Francisco Unified School Dist.</u>, 237 F.3d 1026, 1031 (9th Cir. 2001).  The Court will not undertake to mine the record for triable issues of fact.  <u>Id.</u>

**III.   ANALYSIS**

Plaintiff's Third Amended Complaint alleges that Dr. Suryadevara was professionally negligent and acted with deliberate indifference to her serious medical condition.   Dr. Suryadevara moves for summary judgment on both counts.  The Court will address each in turn below.

**A.       Professional Negligence**

Plaintiff alleges in her Third Amended Complaint that Dr. Suryadevara owed a duty to Plaintiff to use the level of skill, knowledge and care in her diagnosis and treatment that

1
2
3
4
5
6

other reasonably careful physician would use in the same or similar circumstances. Plaintiff alleges Dr. Suryadevara breached this duty of care and failed to properly diagnose and treat Plaintiff for her serious cardiac condition by, among other things, delaying Plaintiff's treatment and the maintenance of her pacemaker. (Pl.'s Third Am. Compl. ¶52).) In common parlance, Plaintiff alleges medical malpractice.

7
8
9
10
11

Defendant Suryadevara moves for summary adjudication of this claim in his favor. He asserts that the undisputed facts establish that he was not Plaintiff's treating physician and, therefore, owed her no duty of care.  He also asserts that, even if there was some duty, at all times relevant to his case, his conduct fell within the applicable standard of care.

12
13
14
15
16

Although Plaintiff does not oppose summary judgment on this grounds, (Pl.'s Opp. p. 2), the Court must examine the merits to determine whether there is a genuine issue of material fact in dispute.  See Martinez v. Stanford, 323 F.3d 1178, 1183 (9th Cir. 2003) (in evaluating motion for summary judgment, district court must determine whether there is a genuine dispute of material fact regardless of whether plaintiff has opposed the motion).

17
18
19
20
21
22
23
24
25
26
27

In a medical malpractice case, the plaintiff must establish by expert testimony: (1) the duty of the professional to use such skill, prudence and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence. Simmons v. West Covina Medical Clinic, 212 Cal. App.3d 696, 702 (1989).  Thus to prevail, the plaintiff must establish the doctor's  care and treatment fell below the relevant "standard of care."  The standard of care is met when a physician or surgeon exercises, in diagnosis and treatment, that reasonable degree of skill, knowledge, and care ordinarily possessed and exercised

-9-

by members of the medical profession under similar circumstances.  Burgess v. Superior Court, 2 Cal. 4th 1064, 1081 (1992).  Mere error of judgment, in the absence of a want of reasonable care and skill, will not render a health care provider responsible for untoward consequences in the treatment of his patient.  Huffman v. Lundquist, 37 Cal.2d 465, 475 (1951).  "[A] doctor is not a warrantor of cures or required to guarantee results." Stephenson v. Kaiser Found. Hospitals, 203 Cal. App.2d 631, 636 (1962).

The plaintiff in a medical malpractice case must provide expert testimony establishing the probability of negligence.  Flowers v. Torrance Memorial Hospital Medical Center, 8 Cal. 4th 992, 1001 (1994).  When a defendant moves for summary judgment and supports his motion with expert declarations that his conduct fell within the community standard of care, defendant is entitled to summary judgment unless the plaintiff comes forward with conflicting expert evidence.  Munro v. Regents of University of California, 215 Cal. App.3d 977, 985 (1989); Jambzian v. Borden, 25 Cal. App.4th 836 (1994).

In this case, Dr. Suryadevara has put forth evidence that his conduct at all times relevant to this case fell within the applicable standard of care.  (DUF No. 58) There is also expert evidence that Plaintiff's treating physicians' care (over which Dr. Suryadevara ostensibly had supervisory power and authority) fell within the acceptable standard of care. (DUF Nos. 53-55.)  Plaintiff has not submitted any expert testimony to refute this evidence. As such, Plaintiff has failed to establish a genuine dispute of material fact with respect to whether Dr. Suryadevara's care fell below the standard of care.  The Court recommends that Defendant Suryadevara's Motion for Summary Judgment be granted as to Plaintiff's professional negligence claim.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

### B.    Deliberate Indifference

Plaintiff's Third Amended Complaint also alleges that Defendant Suryavara was deliberately indifferent to Plaintiff's serious medical needs and thereby violated her rights under the Eighth Amendment.   Defendant argues that summary judgment should be granted on this claim because Plaintiff cannot show that he was deliberately indifferent to her serious medical needs.  Defendant claims that he was not Plaintiff's treating physician and did not deny, delay or interfere with Plaintiff's medical treatment.   Defendant also argues that Plaintiff's claims are based solely on her disagreement with treatment decisions in her case and that such disagreement is not an Eighth Amendment violation.

Plaintiff's Eighth Amendment complaints arise out of: (1) the distress she asserts she experienced while awaiting a new pacemaker; and (2) the distress caused by delays in checking/calibrating her new pacemaker.   These two concerns will be analyzed successively under the deliberate indifference standard applicable to each.

### 1.    Deliberate Indifference Standard

Denial of medical attention to prisoners constitutes an Eighth Amendment violation if the denial amounts to deliberate indifference to serious medical needs of the prisoners. Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 292 (1976).   Under the Eighth Amendment's standard of deliberate indifference, a person is liable for denying a prisoner needed medical care only if the person "knows of and disregards an excessive risk to inmate health and safety." Id.

The "deliberate indifference" standard involves an objective and a subjective prong. First, the alleged deprivation must be, in objective terms, "sufficiently serious." Farmer v. Brennan, 511 U.S. 825, 834 (1994). A medical need is serious "if the failure to treat the

prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir.1991).  By establishing the existence of a serious medical need, a prisoner satisfies the objective requirement for proving an Eighth Amendment violation. Farmer v. Brennan, 511 U.S. at 834.

The second prong involves the subjective component.  If a prisoner establishes the existence of a serious medical need, he or she must then show that prison official responded to the serious medical need with deliberate indifference. Farmer, 511 U.S. at 834.  In general, deliberate indifference may be shown when prison officials deny, delay, or intentionally interfere with medical treatment, or it may be shown by the way in which prison officials provide medical care. Hutchinson v. United States, 838 F.2d 390, 393-94 (9th Cir.1988).  The prison official must act with a "sufficiently culpable state of mind," which entails more than mere negligence, but less than conduct undertaken for the very purpose of causing harm. Farmer, 511 U.S. at 837; Wilson v. Seiter, 501 U.S. 294, 302-03 (1991) (indicating that there is no significant distinction between wantonness and deliberate indifference).  A prison official does not act in a deliberately indifferent manner unless the official "knows of and disregards an excessive risk to inmate health or safety." Farmer, 511 U.S. at 837; Gibson v. County of Washoe, Nevada, 290 F.3d 1175, 1187 (9th Cir. 2002) ("If a person should have been aware of the risk, but was not, then the person has not violated the Eighth Amendment, no matter how severe the risk.").

"Deliberate indifference is a high legal standard." Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004). "[T]he deliberate indifference doctrine contains a heightened foreseeability requirement, this requirement differs from the traditional negligence foreseeability requirement only insofar as deliberate indifference requires the defendant

to be <u>subjectively</u> aware that <u>serious</u> harm is likely to result from a failure to provide medical care." <u>Gibson</u>, 290 F.3d at 1193 (emphasis in original).  Before it can be said that a prisoner's civil rights have been abridged with regard to medical care, however, "the indifference to his medical needs must be substantial.  Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." <u>Broughton v. Cutter Laboratories</u>, 622 F.2d 458, 460 (9th Cir.1980) (citing <u>Estelle</u>, 429 U.S. at 105-06).

### 2.   Pacemaker Replacement

On January 26, 2004, Plaintiff's pacemaker was evaluated in Dr. Ashraf's office by a technician from St. Jude Medical who advised that its battery would last only three more months and needed to be replaced. (DUF No. 31; Fraher Decl. ¶ 11.)  According to Plaintiff, Dr. Ashcraft told her that chest pain she experienced was caused by the low battery and would increase until the battery was replaced.  He said he would schedule a pacemaker replacement as soon as possible.  (Fraher Decl. ¶ 11.)

On March 26, 2004,  Dr. Ashraf examined Plaintiff and evaluated her pacemaker with an EKG and a magnet. He determined that the pacemaker was functioning normally (DUF No. 33), but had a life expectancy of only one month.   Dr. Ashraf scheduled pacemaker replacement surgery for April 8, 2004. ( Dec. Fraher  ¶ 13.)

On April 8, 2004, Plaintiff's  pacemaker generator was surgically replaced.  (DUF No. 37.)  The new pacemaker has functioned normally and without ill effect to Plaintiff. (DUF No. 47.)

Plaintiff asserts that from the time of her December 2003 hospital visit until the time of her April 2004 surgery she suffered chest pain, anxiety, emotional distress and sleeplessness.  Plaintiff's emotional distress increased significantly after she learned, on

-13-

1  January 26, 2004, that her pacemaker would only last another three months. (Fraher Decl.

2  ¶ 18.)

3      Even if the Court assumes that Plaintiff has established a serious medical need

4  sufficient to satisfy the objective prong of the deliberate indifference standard, she has

5  failed to demonstrate any factual dispute as to the subjective prong.   Rather than

6  deliberate indifference, the evidence shows that Plaintiff's medical team was responsive

7  to her needs from the time it was learned that the battery needed to be replaced until the

8  surgery actually occurred.  Plaintiff's pacemaker was scheduled for replacement and was

9  actually replaced within three months of the January appointment (and within a month of

10  the March appointment).  Plaintiff received ongoing medical care during that period.

11      Because Plaintiff ultimately received the medical care she desired, her only claim

12  related to the replacement of her pacemaker could possibly relate to the delay in

13  performing the surgery.  While the Court can certainly imagine why Plaintiff would have

14  preferred to have her pacemaker replaced sooner and that the knowledge of the end of her

15  pacemaker's battery caused her anxiety, the record here does not show that the delay was

16  unreasonable.  As noted, Plaintiff's pacemaker was replaced within the time prescribed by

17  doctors.

18      To the extent that Plaintiff is challenging the course of treatment chosen by her

19  physicians, such claim fails.  Plaintiff cannot show that the decision to wait until April 2004

20  to replace her pacemaker was medically unacceptable or in conscious disregard of an

21  excessive risk to her health.  See Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004).

22      Plaintiff received considerable medical attention between December 2003 and April

23  2004.  She has failed to show that the treatment by any of her physicians (much less Dr.

Suryadevara) constituted deliberate indifference.  See Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989) (where plaintiff was being treated regularly and such treatment was effective, disagreements as to the timing and course of that treatment did not constitute deliberate indifference).  As such, the Court recommends that summary judgment be granted on this claim.

> ### 3.   Delayed Pacemaker Calibration

Plaintiff argues that Dr. Suryadevara was deliberately indifferently to the fact that her pacemaker calibrations were not occurring every six months as had been recommended by her treating physician.

It is undisputed that, after Plaintiff's pacemaker was replaced, her treating cardiologists recommended that it be calibrated every six months. (Fraher Decl. ¶¶ 21, 36 & 39.)  It is also undisputed that often these calibrations were late. (Fraher Decl. ¶ 27, 40, 41, 44 & 45.)  Plaintiff  testified that between 2003 and 2008, she was forced to file a formal appeal "for every single calibration" and that Defendant Suryadevara was aware of and responsible for the delays because he was the CMO and signed off on all of her 602s. (Fraher Dep., pp. 119:19 -122:4.)

Defendant acknowledges that as the CMO at CCWF, his duties included providing clinical management and  supervision to all medical clinicians, supervising the delivery of health care services at CCWF and reviewing and ruling on inmate health care complaints or 602s.  (DUF Nos. 5 & 6.)   Though he was not Plaintiff's treating physician, Dr. Suryadevara does not deny that he learned of Plaintiff's condition in the course of his review and action on her 602 complaints and was aware of her delayed calibrations. (DUF No. 12.)

Nevertheless, the Court finds that Plaintiff has failed to show a genuine dispute of fact as to whether Dr. Suryadevara was deliberately indifferent to her serious medical needs.

Plaintiff has shown that, through his reviews of her medical appeals, Dr. Suryadevara was aware of the delays associated with Plaintiff's pacemaker calibrations as of late 2005 or early 2006.  Thus, Plaintiff has established that Dr. Suryadevara had knowledge of her serious medical needs.  She has not, however, shown that he  was deliberately indifferent to such needs.  Plaintiff has submitted evidence that her treating cardiologist recommended that the pacemaker be calibrated every six months.  But there is no evidence in the record to support Plaintiff's allegation that failure to meet this six-month recommendation constituted "an excessive risk to inmate health or safety." Farmer, 511 U.S. at 837.  In fact, the only expert testimony in the record shows that the care Plaintiff received was within the standard of care. (DUF Nos. 53-57; 58-62.)  Additionally, it is undisputed that after Plaintiff's April 8, 2004 pacemaker replacement, she exercised by walking eight to ten miles daily. (DUF No. 41.)  By May 2004, she was not suffering physical or emotional problems with her pacemaker. (DUF No. 42.)  The new pacemaker has functioned normally and without ill effect to Plaintiff. (DUF No. 47.)

Plaintiff argues that "[a]s a medical doctor, Defendant Suryadevara was aware that a failure to timely test and calibrate Plaintiff's pacemaker could result in further significant injury to the Plaintiff or the unnecessary and wanton infliction of pain."  (Pl.'s Opp. p. 11.)  However, there is no evidence in the record to support this contention.  Dr. Suryadevara has stated that, in his opinion, Plaintiff "did not suffer any injury due to not receiving pacemaker evaluations by a manufacturer's technician on exactly six-month intervals."

-16-

(Suryadevara Decl. ¶ 10.)  Plaintiff has submitted no contrary evidence.

There is no evidence in the record that the failure to ensure that Plaintiff's pacemaker was calibrated every six months posed an excessive risk to her health or safety.  Because this is an essential element of Plaintiff's deliberate indifference claim and Plaintiff has failed to meet her burden, summary judgment is appropriate.

Moreover, even if the Court were to assume that the failure to schedule pacemaker calibrations every six months constituted deliberate indifference, Plaintiff has failed to show that Dr. Suryadevara was responsible for such indifference.  In McGuckin v. Smith, 974 F.2d 1050 (9th Cir. 1992), the plaintiff was denied a necessary surgery for over three years and suffered extreme pain during that delay.  The only two defendants in that case were plaintiff's treating physicians.  Though the seriousness of plaintiff's medical condition was not disputed, the Ninth Circuit held that the district court had properly granted summary judgment to the physicians because the record showed that prison administrators were responsible for scheduling diagnostic examinations and surgeries, not the doctors.  Because the doctors did not control when the plaintiff was scheduled for surgery, they were not responsible for the delay and were not deliberately indifferent to plaintiff's medical condition.  Id. at 1062.

Similarly, in this case the evidence shows that CCWF depended on Plaintiff's cardiologist to schedule Plaintiff's pacemaker calibrations and that another company, St. Jude, was responsible for performing the calibrations.  (Fraher Decl. ¶ 43; Fraher Dep. P. 112, ln. 8-10.)  The record shows that CCWF staff, on a number of occasions, had difficulty scheduling Plaintiff's appointments with St. Jude and/or her cardiologist.  For example, in April 2005, CCWF staff responded to one of Plaintiff's 602s by stating: "The pacemaker

-17-

people kept cancelling the appts I would make for you.  I did get a new appt date for the first week of May.  Hopefully they will keep this date & not cancel anymore." (Fraher Decl. ¶ 27.)  In response to one of Plaintiff's medical appeals, Dr. Suryadevara stated: "Please remember we depend on the specialist to give us an appointment date, it is not always at our discretion when the appointment date is to be set."  (Id.)

Plaintiff argues that, because Dr. Suryadevara signed off on her 602s, he was responsible for scheduling her pacemaker calibrations.  (Fraher Dep. pp. 121-22.) However, this only shows that Dr. Suryadevara was responsible for responding to her medical appeals.  It does not support her contention that he was responsible for scheduling her pacemaker calibrations and/or ensuring that they occurred every six months.

Plaintiff has produced no evidence showing that Dr. Suryadevara was responsible for the scheduling of her calibration appointments or that he had any control over whether such appointments occurred in a timely manner.  As such, Plaintiff has failed to establish the existence of a disputed fact as to whether Dr. Suryadevara was deliberately indifferent to her serious medical needs.  See McGuckin v. Smith, 974 F.2d 1062; Walker v. Benjamin, 293 F.3d 1030, 1038 (7th Cir. 2002) (doctor not liable for delay in treatment when he was not responsible for scheduling appointments); Coyle v. Cambra, 2005 WL 2397517, *10-11 (N.D. Cal. Sept. 27, 2005) (treating physician not responsible for six month delay in scheduling orthopedic referral because central office scheduled specialist referrals).

IV.   **CONCLUSION**

For the reasons stated above, the Court RECOMMENDS the following:

1.    Defendant's Motion for Summary Judgment be GRANTED as to all claims

-18-

against Defendant Suryadevara;

2.      Defendant Suryadevara be DISMISSED as a party to this action;

3.      Judgment be entered in favor of Defendants;

4.      This case be closed.

These Findings and Recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1).  No later than March 15, 2011, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service of the objections.  Due to exigencies on the Court's schedule, **no extensions to these objections deadlines will be granted**.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

Dated:    March 2, 2011            /s/ *Michael J. Seng*
                                              UNITED STATES MAGISTRATE JUDGE

-19-